**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

Sue Doe,

           *Plaintiff-Appellant,*

v.

Linda Kidd; Stan Butkus; Kathi Lacy; South Carolina Department of Disabilities and Special Needs; Robert Kerr; South Carolina Department of Health and Human Services,

           *Defendants-Appellees.*

No. 05-1570

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Margaret B. Seymour, District Judge.
(CA-03-1918)

Argued: May 24, 2007

Decided: September 19, 2007

Before KING and GREGORY, Circuit Judges,
and Frank D. WHITNEY, United States District Judge for the
Western District of North Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Gregory wrote the opinion, in which Judge King concurred. Judge Whitney wrote a separate opinion concurring in the judgment in part and dissenting in part.

**COUNSEL**

**ARGUED:** Patricia L. Harrison, Columbia, South Carolina, for Appellant. Kenneth Paul Woodington, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees. **ON BRIEF:** William H. Davidson, II, DAVIDSON, MORRISON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees.

---

**OPINION**

GREGORY, Circuit Judge:

Sue Doe, who has developmental disabilities including epilepsy, mild mental retardation, and cerebral palsy, filed this action concerning her application for Medicaid services from the state of South Carolina. The district court granted summary judgment to Appellees: the South Carolina Department of Disabilities and Special Needs, the South Carolina Department of Health and Human Services, and various officials at the helm of the two departments. Because Doe's two claims on appeal are not, as the district court found, moot, but one of her claims nonetheless fails as a matter of law, we affirm in part and vacate and remand in part.

I.

Medicaid is an optional, federal-state program through which the federal government provides financial assistance to states for the medical care of needy individuals. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). Once a state elects to participate in the program, it must comply with all federal Medicaid laws and regulations. *Id.* The South Carolina Department of Health and Human Services ("DHHS") is the state agency responsible for administering and supervising Medicaid programs in South Carolina. The South Carolina Department of Disabilities and Special Needs ("DDSN") has specific authority over the state's treatment and training programs for people with mental retardation and related disabilities.

This case involves the Medicaid waiver program created by 42 U.S.C. § 1396n(c) (2000), which permits states to waive the require-

ment that persons with mental retardation or a related disability live in an institution in order to receive certain Medicaid services. *See generally Bryson v. Shumway*, 308 F.3d 79, 82 (1st Cir. 2002) ("[The program] allow[s] states to experiment with methods of care, or to provide care on a targeted basis, without adhering to the strict mandates of the Medicaid system."). When an individual in South Carolina applies for DDSN services, including the waiver program, DHHS first determines whether the individual is eligible for Medicaid funding. Thereafter, DDSN determines whether the individual is eligible for DDSN services and, if so, what "level of care" the individual requires. To be given the option under the waiver program of receiving services at home or in the community, rather than in an institution, individuals must first qualify for the Intermediate Care Facility for the Mentally Retarded ("ICF/MR") level of care—that is, they must meet the criteria necessary to reside in an institution like a nursing home. If approved, waiver services are provided in a variety of settings including, in order of restrictiveness: (1) a Supervised Living Program II ("SLP II"), an apartment where recipients of DDSN services live together; (2) a Community Training Home I ("CTH I"), a private foster home where a recipient of DDSN services resides with a family, one member of whom is a trained caregiver; and (3) a Community Training Home II ("CTH II"), a group home with live-in caregivers for four or fewer recipients of DDSN services. Appeals from DDSN decisions about the services, if any, it will provide are taken to a DHHS hearing officer and, after that, to the state of South Carolina's Administrative Law Judge Division.

Doe applied for services under DDSN's waiver program in July 2002, after previous requests for DDSN services had been denied in 2000 and 2001. In December 2002, without making a determination as to Doe's eligibility for the waiver program, DDSN placed Doe on the non-critical waiting list for the program. Doe appealed this decision to DHHS, adding a claim that DDSN failed to serve her within a reasonable amount of time as required by federal regulations. While the appeal was pending, DDSN moved Doe to the top of the critical waiting list for the program and developed a plan of care for her, which largely involved her living at home with her mother where she would receive various in-home services. DDSN then moved to dismiss Doe's appeal.

At the March 2003 hearing on DDSN's motion to dismiss, Doe conceded that DDSN had moved her to the top of the critical waiting list and had found her eligible for services under the waiver program earlier that month. Finding that all the appealed issues had already been resolved in Doe's favor, the DHHS hearing officer dismissed Doe's appeal. Doe did not appeal the dismissal to the state's Administrative Law Judge Division. At the end of March, however, Doe learned that she had been terminated from the waiver program. She requested a hearing on this decision and, several months later, learned that her Medicaid eligibility was to terminate as well (although it never did).

During May and June of 2003, Doe requested another hearing on the grounds that she had not yet received the services promised by DDSN in her plan of care. DDSN protested that Doe's family was not cooperating in availing themselves of those services. The DHHS hearing officer held Doe's request for an appeal in abeyance because he considered Doe's Medicaid eligibility to be in question. Doe had also demanded immediate CTH I or CTH II residential placement (rather than continued in-home services), with a provider of her choice, because her mother, whose mental health was rapidly declining, was no longer able to care for her and was moving out of state without Doe. Doe voiced her opposition to DDSN's chosen provider for residential services, the Babcock Center, based on reports that the center had a history of abusing and neglecting residents. In response to Doe's petitions, DDSN requested proof of her critical family circumstances before taking action.

On June 9, 2003, Doe filed this action, alleging violations of the Medicaid Act, 42 U.S.C. §§ 1396-1396v, the Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327 (codified as amended in scattered sections of 42 U.S.C.), and various state laws. Only two of Doe's original seven claims are at issue here: (1) a claim under 42 U.S.C. § 1983 that Appellees "have deprived Doe of Medicaid services—namely, residential habilitation services and freedom of choice of providers of those services" and (2) a claim that Appellees have "failed to provide with reasonable promptness the residential habilitation and other Medicaid services Doe has requested since 2000" in violation of § 1396a(a)(8) of the Medicaid Act. Doe sought an order directing DDSN to provide her with residential habilitation

services from the provider of her choice, payment of her medical expenses, and fees and costs.

On July 2, 2003, Doe filed a motion for a preliminary injunction seeking relief substantially similar to that requested in her complaint. Doe's mother had by then left South Carolina, and her father was unable to take her into his home. Accordingly, shortly after the hearing on the motion for a preliminary injunction, DDSN placed Doe in a CTH II (group home) facility in Newberry, South Carolina, where she received respite (or temporary) services. DDSN maintains that it did so because of Doe's family circumstances, not because she was qualified for that most-restrictive setting; in fact, DDSN found Doe to need a CTH I (foster home) or SLP II (apartment) setting. Doe continues to reside at the Newberry facility. In light of Doe's placement at Newberry, the district court denied Doe's motion for preliminary injunctive relief.

Appellees then moved for summary judgment. At a hearing on the motion in September 2004, Doe explained that she had consistently requested CTH II residential habilitation services in her home community, near Columbia, South Carolina. Doe explained that she could not avail herself of these providers until DDSN approved the placement, yet DDSN would only approve a CTH I placement. Doe further explained that, although DDSN ultimately found her eligible for the waiver program and is now providing her with CTH II residential services, DDSN considers Doe's current CTH II placement at Newberry temporary and has acknowledged that Doe may be moved out of residential facilities altogether depending on the setting DDSN ultimately finds her to require. Doe therefore argued against summary judgment on the grounds that she has never received the residential services she requested by the provider she chose, nor a fair hearing on the merits, and that she is being threatened with termination of services altogether. Doe admitted at the hearing that she had already prevailed on three causes of action in her complaint.

On December 9, 2004, the district court dismissed as moot three of Doe's causes of action—including the two on appeal here—on the grounds that at the hearing on the motion for summary judgment, Doe admitted that she had already received the relief requested in those counts. The district court granted summary judgment to Appellees on

Doe's remaining four counts and denied her request for attorney's fees and for reconsideration. Doe has appealed, asking us to determine (1) whether her claim that Appellees have deprived her of her right to reasonably prompt residential habilitation services is moot because Appellees have provided Doe with temporary services, and (2) whether her claim that she has been denied the freedom of choice of qualified providers of Medicaid services is moot when Appellees have provided her services from a provider they, and not Doe, chose. We review the district court's summary judgment ruling de novo, viewing the facts in the light most favorable to Doe as the non-moving party and drawing all reasonable inferences in her favor. *See Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 416 (4th Cir. 2005).[1]

## II.

Doe first appeals the district court's decision to dismiss as moot her § 1983 claim that Appellees violated the Medicaid Act by providing her with temporary respite services instead of providing her, with reasonable promptness,[2] the residential habilitation services approved in her 2003 plan of care.[3] Section 1396a(a)(8) of the Act requires that state "medical assistance . . . be furnished with reasonable promptness to all eligible individuals." Federal regulations direct state agencies to

---

[1]There have been state administrative proceedings in Doe's case since she noted her appeal to this Court. We do not consider the outcome of these proceedings because the outcome has no effect, preclusive or otherwise, on the issues Doe raises before this Court.

[2]Given the paucity of references to "reasonable promptness" in Doe's appellate brief, Appellees argue that Doe has abandoned this issue on appeal. We are able to discern Doe's claim from her brief and therefore disagree.

[3]Respite services and residential habilitation services are distinct. Respite care, which Doe is currently receiving, "is furnished on a short-term basis due to the regular care giver's absence or need for relief." *Benjamin H. v. Ohl*, No. 3:99-0338, 1999 WL 34783552, at *2 (S.D. W. Va. July 15, 1999). Residential habilitation, which Doe has requested, "helps recipients with the skills needed for daily living, such as eating and performing personal hygiene, household chores, and food preparation. It also focuses on the social and adaptive skills which enable an individual to avoid institutionalization." *Id.* at *3.

determine an applicant's eligibility for Medicaid within ninety days of the date of application and to "[f]urnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures." 42 C.F.R. §§ 435.911, 435.930 (2002).

Appellees argue that Doe's reasonable promptness claim is moot because Appellees began providing Doe with some services before the DHHS hearing on their motion to dismiss, and certainly before the federal court hearing on their motion for summary judgment. Moreover, Appellees argue, Doe conceded the claim's "mootness" by answering in the affirmative when the district court asked her whether she had already prevailed on this claim at the DHHS hearing.

A.

A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969). Where, as here, a defendant's voluntary conduct is the basis for the potential mootness, it is "well settled that [the] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation marks and citations omitted). Here, Doe challenges Appellees' failure to provide her with residential habilitation services promptly. Viewing the facts in the light most favorable to Doe, Appellees have not yet voluntarily ceased this conduct: by their own admission, Doe is "only in this Newberry CTH II for respite [services] or until her true status is determined." J.A. 384. Therefore, the issues presented in Doe's reasonable promptness claim continue to be live and the parties continue to have a legally cognizable interest in the outcome.

A separate question is whether, by agreeing with the district court that she "prevailed" on her reasonable promptness claim (without so much as probing the district court's usage of the term "prevail" or explaining to the court the breadth of her claim, as she has done before this Court) and now seeks only attorney's fees, Doe *waived* her claim. "[F]ederal law is well-settled that waiver is the voluntary and

intentional relinquishment of a known right, and courts have been dis-inclined lightly to presume that valuable rights have been conceded in the absence of clear evidence to the contrary." *United States v. Stout*, 415 F.2d 1190, 1192-93 (4th Cir. 1969). Doe's summary judgment and appellate briefs make clear that, whatever misstatements or understatements she made during the summary judgment hearing, she did not intend to relinquish her right to have the district court consider her reasonable promptness claim on its merits. We find that her exchange with the district court at the summary judgment hearing did not constitute a waiver of the claim.

### B.

Having determined that Doe's reasonable promptness claim is nei-ther moot nor waived, we consider whether Doe may enforce § 1396a(a)(8) through a § 1983 action. Appellees argue that she may not because Congress provided a comprehensive remedial scheme for individual state Medicaid cases, thereby precluding § 1983 as a means of review. The district court, having dismissed Doe's claim as moot, did not reach this question.[4]

Section 1983 imposes liability on any person who, under the color of state law, deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws." Some statutes fore-close private enforcement by § 1983. In absence of an "express provi-sion or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement[,]" the Supreme Court will find "private enforcement foreclosed only when the statute itself creates a remedial scheme that is sufficiently comprehensive . . . to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Wilder*, 496 U.S. at 520-21 (quotation marks and cita-tions omitted).

Using this rule, the Supreme Court has decided that at least one provision of the Medicaid Act does not preclude individual enforce-ment through a § 1983 action. In *Wilder*, the Court observed that only

---

[4]The district court did decide that § 1396a(a)(30), a freedom of choice provision that Doe does not raise in this appeal, does not create an indi-vidual right enforceable under § 1983.

twice has it found "a remedial scheme established by Congress sufficient to displace the remedy provided in § 1983." *Id.* at 521 (citing *Smith v. Robinson*, 468 U.S. 992 (1984), and *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1 (1981)). The Court subsequently concluded that "[t]he Medicaid Act contains no comparable provision for private judicial or administrative enforcement." *Id.* It therefore allowed health care providers to sue the Commonwealth of Virginia under § 1983 for violating a provision of the statute, § 1396a(a)(13)(A), regarding reimbursement for providers. Fifteen years later, the Supreme Court cited *Wilder* when it listed the Medicaid Act as an example of a federal statute for which § 1983 is available, given that the statute does not provide a private judicial remedy for rights that have been violated. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121-22 (2005).

Because *Wilder* involved a provision of the Medicaid Act very different from the provision at issue here, we analyze the provision Doe invokes, § 1396a(a)(8), according to the guidelines set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997), to determine whether that provision creates a private right enforceable under § 1983. *See Blessing*, 520 U.S. at 342 (noting the importance of "distinguishing among the numerous rights that might have been created by [the] federally funded" program at issue). *Blessing* listed three factors that this Court must consider in determining whether a statutory provision gives rise to an individual right:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Id.* at 340-41 (citations omitted). Even when the presence of these three factors creates a presumption that a statutory provision gives rise to an individual right, we must consider whether Congress expressly or impliedly foreclosed a remedy under § 1983. *See Blessing*, 520 U.S. at 341. As a rule, "where the text and structure of a stat-

ute provide no indication that Congress intend[ed] to create new individual rights, there is no basis for a private suit." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286 (2002). This is so because "*rights*, not the broader or vaguer 'benefits' or 'interests,' [are to] be enforced under the authority of [§ 1983]." *Id.* at 283.

Applying the *Blessing* test to the reasonable promptness provision found in § 1396a(a)(8), we conclude that the provision gives rise to a right enforceable under § 1983.[5] First, the provision is expressly intended to benefit "all" individuals eligible for Medicaid assistance, a group that, the parties do not dispute, includes Doe. *See* § 1396a(a)(8). Second, the provision is not so "vague and amorphous" that the judiciary cannot competently enforce it: the provision is clear that the standard for informing applicants of their eligibility for Medicaid services is "reasonable promptness" and the relevant federal and state regulations and manuals define reasonable promptness as forty-five days or ninety days, depending on the applicant. *See, e.g.*, 42 C.F.R. § 435.911; South Carolina Medicaid Manual, cited at J.A. 242; United States Department of Health & Human Services Center for Medicaid and State Operations, Olmstead Update No: 4, at J.A. 290. Third, the provision uses mandatory rather than precatory terms: it states that plans "must" provide for assistance that "shall" be delivered with reasonable promptness. *See* § 1396a(a)(8).

Finally, the Medicaid Act does not explicitly forbid recourse to § 1983. *Wilder*, 496 U.S. at 521. Nor does the Act impliedly forbid such recourse: although the Act provides that states should adopt a fair hearing process, the Act does not contain a "*comprehensive* enforcement scheme that is *incompatible* with individual enforcement under § 1983." *Blessing*, 520 U.S. at 341 (emphases added). The statute merely requires state plans "to provide for granting an opportunity for a fair hearing before the State agency [responsible for the Medic-

---

[5]Section 1396a(a)(8) provides:

A State plan for medical assistance must—

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals . . . .

aid program] to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness," § 1396a(a)(3), and generally states that the United States Secretary of Health and Human Services should withhold future Medicaid payments to states that fail to comply with § 1396a of the Act, *see* § 1396c. Medicaid regulations regarding the fair hearing process are more extensive, but they are not incompatible with § 1983 enforcement. *See* 42 C.F.R. § 431.200-250 (2002); *Blessing*, 520 U.S. at 348 (commenting specifically upon the "limited state grievance procedures for individuals" in the Medicaid Act); *id.* (holding that "a plaintiff's ability to invoke § 1983 cannot be defeated simply by [t]he availability of administrative mechanisms to protect the plaintiff's interests" (alteration in original and quotation marks omitted)); *accord Wilder*, 496 U.S. at 521, 523.

We note that three circuits have engaged in similar analysis of § 1396a(a)(8) and reached the same conclusion. *See Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 183 (3rd Cir. 2004) (holding that an analysis based upon *Gonzaga*, *Blessing*, and other cases "compels the conclusion that the provisions invoked by plaintiffs—42 U.S.C. §§ 1396a(a)(8), 1396a(a)(10), and 1396d(a)(15)—unambiguously confer rights vindicable under § 1983"); *Bryson v. Shumway*, 308 F.3d 79, 88-89 (1st Cir. 2002) (holding that § 1396a(a)(8) is enforceable by Medicaid recipients under § 1983); *Doe ex rel. Doe v. Chiles*, 136 F.3d 709, 714 (11th Cir. 1998) (same).[6] In sum, Doe may proceed under § 1983 to address any failure by Appellees to comply with the reasonable promptness provision of the Medicaid Act. Because her claim is neither moot nor waived, we vacate the district court's dismissal of her claim and remand for further proceedings.

III.

Doe next appeals the district court's decision to dismiss as moot her § 1983 claim that Appellees violated the freedom of choice provision in § 1396a(a)(23) of the Medicaid Act. That provision requires

---

[6]We have once before declined to dismiss a § 1983 action seeking to enforce § 1396a(a)(8), among other provisions of the Medicaid Act, but we did so on the unrelated ground of sovereign immunity. *Antrican v. Odom*, 290 F.3d 178, 191 (4th Cir. 2002).

state Medicaid plans to provide that any recipient of Medicaid assistance "may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services." § 1396a(a)(23). In short, the provision "gives recipients the right to choose among a range of qualified providers, without government interference." *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 785 (1980) (emphasis omitted).

Doe contends that Appellees have violated this provision by refusing to approve her for placement at her choice of a CTH II facility in her home community. Doe is not mollified by her current placement at a CTH II facility in Newberry because Newberry is not her home community and because DDSN has admitted that it placed her there only temporarily because of her family circumstances, not because of her actual need for a CTH II setting.

A.

Aside from a reference in a string citation to § 1902(23) of the Social Security Act, which is the same provision as § 1396a(a)(23) of the Medicaid Act, Doe did not cite § 1396a(a)(23) below. This appeal marks the first time Doe cites § 1396a(a)(23) specifically. Citing our rule that "issues raised for the first time on appeal are generally not considered absent exceptional circumstances," *Wheatley v. Wicomico County*, 390 F.3d 328, 334 (4th Cir. 2004), Appellees argue that this Court should not consider Doe's claim.

Doe, however, has not raised a "new theory at the eleventh hour" or made "a last-minute switch in strategy," the type of tactics this Court's rule is designed to discourage. *Id.* at 335. Below, Doe did not cite the provision of the Medicaid Act upon which she relies, but her complaint did claim that Appellees have denied her the right to choose among providers and she did argue that claim before the district court.

Moreover, the district court did "pass upon" Doe's freedom of choice claim, albeit without reference to § 1396a(a)(23). *Cf. Bakker v. Grutman*, 942 F.2d 236, 242 (4th Cir. 1991) ("Generally, a federal appellate court may not consider an issue which was not passed upon

by the trial court."). At the hearing on Appellees' motion for summary judgment, the court repeatedly sought confirmation that Doe's position was that she had been denied the right to move into the CTH II facility of her choice. The court asked both parties whether Doe, Doe's treatment team, or DDSN had the right to choose among the various settings for rehabilitation services, and on what authority the parties relied for their divergent points of view. The court also inquired whether Doe had taken the proper procedural steps in requesting a specific placement by DDSN and whether the court had jurisdiction to review DDSN's determination that Doe required a CTH I setting.

We will not, therefore, refuse to consider Doe's freedom of choice claim on the ground that the question was not considered below. The record is clear that the district court considered the claim and simply determined that it was moot.

B.

We find that Doe's freedom of choice claim is not moot, but lacks merit. Doe's position is that once DDSN finds her to qualify for the ICF/MR level of care, she has a choice among the qualified providers operating the various settings that are alternatives to living in an institution (e.g., a SLP, CTH I, or CTH II setting). Because DDSN has consistently relayed to her that it will approve funding only for a CTH I setting and not a CTH II setting, Doe maintains that she is being denied her right to choose among qualified providers.

The record does not support Doe's position. As noted earlier, DDSN determines whether a recipient qualifies for the ICF/MR level of care. Then, after the recipient exercises his or her right to choose home-based and community-based services rather than ICF/MR services (that is, services in an institution or nursing home), DDSN determines which setting will meet the recipient's needs—here, Doe's need for residential habilitation services—whether it be an apartment (SLP I), a foster home (CTH I), or a group home (CTH II). DDSN must determine the services required because it must insure that it meets the needs of the recipient and that it places the recipient in the least restrictive environment, as required by state and federal law. *See, e.g., Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999); S.C.

Code Ann. § 44-20-20 (2006). The Associate Director of DDSN swore out an affidavit stating that DDSN selects the appropriate setting, a 2003 letter from the General Counsel of DDSN confirms as much, and an official from DDSN testified to the same at the hearing on Doe's motion for a preliminary injunction.

Doe has presented nothing that would contradict this evidence. Her counsel's testimonial argument that, in her ten years' experience, the recipient and his or her family, rather than DDSN, choose the appropriate setting is unavailing. The cases Doe cites for the proposition that the Medicaid Act empowers recipients to choose among CTH I, CTH II, and SLP settings—*Olmstead* and *Antrican v. Odom*, 290 F.3d 178 (4th Cir. 2002)—do not stand for that proposition. Further, Doe has not cited any statutory provision, regulation, or policy directive stating that she has a right to choose among various settings—or, as she terms it, levels of service—and she has not presented a witness to testify as much. Section 1396n of the Act merely requires states to inform participants in the waiver program of "the *feasible* alternatives, *if available* under the waiver, at the choice of individuals, to the provision of . . . services in an intermediate care facility for the mentally retarded." § 1396n(c)(2)(C) (emphases added). The only choice referred to in the Medicaid regulations Doe placed into the record is a choice between institutional or home-based and community-based services as a part of the waiver program, a choice that Doe has already been given. *See* 42 C.F.R. § 441.302(d)(2) (2002). She chose the latter. Finally, the one policy manual in the record, a 2001 United States Department of Health and Human Services update for states, supports Appellees' position that DDSN, and not Doe, determines the appropriate setting for her services. The manual states:

> A State is obligated to provide all people enrolled in the waiver with the opportunity for access to all needed services covered by the waiver and the Medicaid State plan. . . . This *does not* mean that all waiver participants are entitled to receive all services that theoretically could be available under the waiver. The State may control procedures based on the need that individuals have for services covered under the waiver. An individual's right to receive a service is dependent on a finding that the individual needs the service,

based on appropriate assessment criteria that the State devel-
ops and applies fairly to all waiver enrollees.

J.A. 289-90. Thus, we are left to conclude that DDSN selects the
appropriate setting for the provision of waiver services. Once a setting
is selected, recipients have a choice of qualified providers among
those who offer services in the setting DDSN has approved; this is the
freedom of choice that 1396a(a)(23) guarantees.

In this case, at the time of the summary judgment proceedings,
DDSN had consistently evaluated Doe as needing a CTH I setting.[7]
Therefore, Doe had a right to choose among providers of CTH I ser-
vices, not a right to choose to live in any CTH II setting she wished.
*Cf. Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170, 178 (2d Cir. 1991)
(reading *O'Bannon* as holding that a Medicaid recipient's freedom of
choice rights are necessarily dependent on a provider's ability to ren-
der services). Doe currently resides in a CTH II facility at Newberry
but, as stated above, DDSN made this placement because her case
became an emergency one, not because DDSN determined that a
CTH II setting was appropriate. *Cf. O'Bannon*, 447 U.S. at 786
("[W]hile a patient has a right to continued benefits to pay for care
in the qualified institution of his choice, he has no enforceable expec-
tation of continued benefits to pay for care in an institution that has
been determined to be unqualified.").

Section 1396a(a)(23) "is clearly drawn to give Medicaid recipients
the right to receive care from the Medicaid provider of their choice,
rather than the government's choice." *Silver v. Baggiano*, 804 F.2d
1211, 1217 (11th Cir. 1986), *abrogated on other grounds by Lapides
v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613 (2002). Appellees
have not violated this provision: Doe has a choice of providers, so

---

[7]The March 2003 plan of care that Doe, Doe's family, and DDSN offi-
cials developed noted her desire to be in "a residential setting location
within the Columbia area chosen by the family" and to have United
Cerebral Palsy, a CTH II provider, as her provider. J.A. 179. But the plan
did not indicate whether Doe would be sent to a CTH I or CTH II facility
and, if so, who would select between the two types of settings. The rec-
ommendation in the plan of care merely stated that Doe "will receive res-
idential habilitation from a DDSN approved provider." J.A. 179.

long as the provider operates a CTH I facility, the kind of setting DDSN has determined would constitute the least restrictive environment for Doe. We therefore affirm, but on different grounds, the district court's dismissal of Doe's freedom of choice claim. *See Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002) (observing that we "can affirm on any basis fairly supported by the record").

## C.

Because Doe's freedom of choice claim fails as matter of law, we do not find it necessary to decide whether § 1396a(a)(23) confers a private right on individuals that may be enforced under § 1983. Even assuming Doe may proceed under § 1983 to enforce § 1396a(a)(23), Appellees are entitled to summary judgment on Doe's claim. *Cf. Burks v. Lasker*, 441 U.S. 471, 475-76 (1979) (holding that the "question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided").

## IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment in Appellees' favor on Doe's freedom of choice claim, vacate the district court's grant of summary judgment on Doe's reasonable promptness claim, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART,*
*VACATED IN PART, AND REMANDED*

WHITNEY, District Judge, concurring in the judgment in part and dissenting in part:

I concur in the result reached in Part III of the majority opinion, because at the very least Doe's "freedom of choice" claim fails as a matter of law, notwithstanding additional doubts I have concerning whether such a claim is even justiciable. I respectfully dissent from the result reached in Part II of the majority opinion, and instead would find Doe's "reasonable promptness" claim to be moot, or would

affirm the district court on the alternative basis that Doe has no private right of action under 42 U.S.C. § 1983.

## I.

Doe's principal claim on appeal centers around the question of whether the State's decision to provide her with "respite" services in a qualified CTH II group home (instead of "residential habilitation" services in a similar type of setting) comports with the requirement that it furnish "assistance" to "eligible individuals" with "reasonable promptness." 42 U.S.C. § 1396a(a)(8). In order to ensure that there is a live case or controversy for the district court to resolve on remand, I would need to be satisfied of two things: first, that Doe is "eligible" to receive the type of "assistance" she seeks to be provided; and second, that Doe is receiving, or at risk of receiving, a level of "assistance" that does not meet the level of "assistance" to which she is entitled by law. Because neither of these conditions can now be satisfied, I would hold that Doe lacks standing to prosecute her "reasonable promptness" claim and consequently would find that claim to be moot.

## A.

To place this issue in proper context, four foundational principles must be laid at the outset of the analysis. First is the principle that Doe's asserted "right" to have certain Medicaid services furnished with reasonable promptness is *wholly contingent* on Doe being deemed eligible for and in need of those services. *See* 42 U.S.C. § 1396a(a)(8) ("[A]ssistance shall be furnished with reasonable promptness to all *eligible* individuals." (emphasis added)).

Second is the related principle that Medicaid eligibility, once found to exist, does not give rise to a perpetual right to Medicaid-funded support. Doe's level of services may be adjusted (and even terminated) to take into account bona fide changes in her needs or eligibility, provided that she is accorded due process prior to any adverse action. *See* 42 C.F.R. § 435.930(b) ("The agency must . . . furnish Medicaid regularly to all eligible individuals *until they are found to be ineligible*." (emphasis added)); 42 C.F.R. §§ 431.220, -.241 (pro-

viding for a fair hearing on the request of an aggrieved Medicaid recipient).

Third is the principle that the state not only has the right to consider how changed circumstances impact Doe's eligibility, but that it also has an affirmative duty to conduct periodic reevaluations to that end. In order to facilitate an efficient allocation of scarce Medicaid resources to those individuals most critically in need, federal regulations require that states "redetermine the eligibility of Medicaid recipients, with respect to circumstances that may change, at least every 12 months." 42 C.F.R. § 435.916(a). Likewise, with respect to services rendered under the Medicaid MD/RD Waiver program (in which Doe participated), South Carolina's Waiver agreement with Health and Human Services obligates it to "provide for an evaluation (and periodic reevaluations, at least annually) of [a recipient's] need for [an intermediate level of care]." (J.A. at 275.)

Last is the principle that sympathy or charity are not sufficient bases for a State to continue providing Medicaid to someone who does not satisfy the very stringent criteria for eligibility. Once a recipient is determined to be ineligible after being afforded a fair hearing, "the agency *must . . . discontinue services* after the adverse decision." 42 C.F.R. § 431.232(d) (emphasis added).

### B.

With these four principles in mind, Doe's personal story bears recounting. The State has never deemed Doe as meeting the criteria for mental retardation (J.A. at 264), and it has consistently treated with skepticism her claim of "related disability" based on her cerebral palsy and epilepsy (J.A. at 261). However, because she appeared to be experiencing "an acute exacerbation of her seizures which may not continue to be severe or lifelong," DDSN left open the door to Doe's provisional admission into the MR/RD Waiver program. (J.A. at 261.)

Also, around this time, Doe's mother (who was her primary care giver) began experiencing psychiatric episodes that limited her ability to provide adequate care for Doe. (J.A. at 263.) Accordingly, DDSN began providing residential habilitation services to Doe in the form of

in-home daytime health care and living assistance,[1] which were intended to ease the burden on Doe's mother without uprooting Doe from her family. (J.A. at 265.) This solution was also intended to comply with the State's obligation to serve Doe in the least restrictive environment appropriate for her functional limitations. (J.A. at 210, 250.)

The mental health of Doe's mother deteriorated significantly over subsequent months and DDSN officials determined that Doe was facing an "imminent risk" of losing her primary care giver due to incapacity. (J.A. at 267.) Accordingly, the less restrictive environment of in-home care was no longer a viable option and the State promptly sought to make available out-of-home residential habilitation services in a CTH I (foster home) setting. (J.A. at 267.) This did not satisfy Doe and her family, however, who insisted that she be placed in an even more restrictive CTH II (group home) setting. Ultimately, the State capitulated to Doe's demands and placed her on an interim basis in the Newberry CTH II facility, until the dispute over a suitable permanent placement could be sorted out.

Although Doe was receiving exactly the level of care she desired once she was moved to the Newberry CTH II facility in July 2003 (this being the reason that the district court dismissed Doe's "reasonable promptness" claim as moot), the State chose to classify these services as "respite" rather than "residential habilitation." Apparently, it is in the subtle distinction between "respite" and "residential habilitation" that the majority finds a live claim. However, unlike the majority, I find no basis to take issue with the State's classification choice since, by the majority's own definition, "respite" services are furnished "due to the regular care giver's absence or need for relief," *supra* note 3, which describes the very facts of this case giving rise to the decision to place Doe in a group home setting.

---

[1]If, as the majority holds in Part III.B. of the lead opinion, DDSN is vested by law with the right to "select[ ] the appropriate setting for the provision of waiver services," then it was not a violation of either 42 U.S.C. §§ 1396a(a)(8) or (23) for the State to provide in-home residential habilitation as opposed to out-of-home residential habilitation, and Doe's lawsuit was meritless even at its inception.

Moreover, I find no basis to take issue with the inherently "temporary" nature of these "respite" services, since the State should not have to impute upon itself a long-term obligation to keep Doe in a setting that it believes is more restrictive than necessary to meet her needs. Indeed, the majority correctly determines in Part III.B. that DDSN is not legally obligated to keep Doe in a CTH II facility simply because that is her preference, and is free to move Doe to a less restrictive setting more appropriate to her needs. Yet in Part II.B., the majority paradoxically finds that the State has not ceased its allegedly illegal conduct for the sole reason that Doe is "only in the Newberry CTH II for respite [services] or until her true status is determined." (J.A. at 384.) The incongruity of these two conclusions could not be more manifest: How can Doe's temporary placement in a CTH II facility until a more appropriate placement is identified be indicative of the State's continuing failure to provide required Medicaid services with reasonable promptness, when at the same time we hold that permanent placement at a CTH II home is not required by law and that her permanent placement should be determined based upon her particular needs and eligibility status?[2]

At the time of the district court's judgment, the legal battle centered around whether Doe ultimately would be placed in a CTH II (group home) facility, in conformity with her wishes and those of her family, or whether she would be placed in a CTH I (foster home) setting, in conformity with the approved Plan of Care in effect at the time. (J.A. at 337, 348-49.) In order for there to have been a live con-

---

[2]Ironically, Doe has not been removed from a CTH II facility to-date, and so the "respite" services that the majority worries are so ephemeral in nature have been continuously provided by the State for more than three years, with all indications being that the State will continue to provide them until all legal proceedings (both here and at the State level) have been concluded. Today's holding proves the adage that "no good deed goes unpunished" by using the State's indulgence in allowing Doe to stay in the setting of her choice pending resolution of her legal challenges to provide support for the conclusion that the State's alleged failure to provide Medicaid services with reasonable promptness is ongoing. This dangerous precedent now encourages states to do the worst possible thing: deny the provision of Medicaid services to those whose eligibility is in question pending exhaustion of administrative appeals and final resolution of judicial review.

troversy surrounding Doe's "reasonable promptness" claim, at least one of these possible outcomes would have to result in the denial of her right to be furnished Medicaid services with reasonable promptness. The majority tells us today that the placement advocated by the State (CTH I) would not result in any impermissible denial of Medicaid services, since Doe has no legal right to self-determine her level of care and DDSN had determined that she was entitled to only a CTH I level of care. And the alternative placement (CTH II) would, in the words of her attorney, provide Doe with "the placement that we have requested" (J.A. at 338), even if, from DDSN's perspective, such a placement is intended to be temporary or even wholly gratuitous. In other words, no matter what the outcome, Doe would have gotten either what she wanted or what she was entitled. Thus, nothing in the record upsets the district court's finding that Doe's "reasonable promptness" claim was moot.

### C.

The district court's dismissal of Doe's "reasonable promptness" claim should not, therefore, be vacated simply on the fact that Doe was at risk of being displaced from a CTH II facility upon determination of her "true status." However, the factual landscape has changed somewhat since the district court's judgment. We now know that the State intends not only to remove Doe from a CTH II facility where she does not belong, but also now intends to discontinue her residential habilitation services altogether, because an investigation into her "true status" has confirmed that she does not meet the stringent eligibility criteria for ICF/MR intermediate level of care. Yet far from providing any additional support for Doe's claim against the State for unreasonably delaying or withholding services, this turn of events squarely forecloses her claim, since standing to assert a "reasonable promptness" violation necessarily presupposes the recipient's continuing eligibility for the services denied.

Here we pick up again where we last left off from Doe's story. Doe's 2003 Plan of Care (J.A. at 170-88) was in effect for a period of approximately one year, after which it was superseded by a new Plan of Care in May 2004 (J.A. at 113-15). This is consistent with the legal requirement, detailed above, that each recipient's eligibility be reevaluated annually. Following the 2004 evaluation, Doe was

approved for a consecutive year of eligibility for "residential habilita-
tion" services (i.e., through Doe's next level of care evaluation sched-
uled for early 2005).

Shortly thereafter, in or around June 2004, Doe's care givers began
to realize that Doe would frequently "initiate[ ] fake or pseudo sei-
zure[s]," which they interpreted to be "manipulative behavior" that
created "an unnecessary dependence on others." (J.A. at 116.) This
reasonably caused DDSN to question whether Doe might have "the
capacity for a greater degree of independence," (J.A. at 116), espe-
cially in light of the fact that a sudden "exacerbation" in the severity
of her epilepsy was a primary factor in finding that Doe was medi-
cally qualified for residential habilitation services under the Medicaid
MR/RD Waiver program in the first place (J.A. at 261). This
prompted DDSN to begin documenting Doe's true seizure frequency
and adaptive functioning abilities, which together suggested that her
limitations were not so severe as to justify ICF/MR intermediate level
of care. (J.A. at 299-300.)

Notwithstanding this new information, as well as a favorable judg-
ment in the district court, DDSN allowed Doe to finish out the term
of her May 2004 Plan of Care in a CTH II group home setting. How-
ever, in April 2005, following her annual level of care evaluation ear-
lier that same year, Doe was notified by DDSN that she no longer
satisfied the eligibility criteria for ICF/MR intermediate level of care,
and that as a consequence her Medicaid MR/RD Waiver services
would be terminated effective May 7, 2005, unless she timely
requested a fair hearing, which she did. On June 5, 2006, following
five days of hearings, a DHHS Hearing Officer upheld the determina-
tion of ineligibility in a thoughtful and comprehensive 34-page
administrative order. (J.A. at 297-330.) That decision is now on
appeal to the South Carolina Administrative Law Court, and the State
is continuing to provide "respite" services until Doe has exhausted her
appeals. (*See* Rule 28(j) filing dated August 6, 2007.)

The sequence of events just described must remove all doubt that,
as of today, Doe's "reasonable promptness" claim is moot, because
she lacks any basis to assert that she is currently eligible to receive
the particular services that she claims are being denied.[3] Doe's theory

---

[3]The parties' briefs focus on whether these state administrative deci-
sions should be given preclusive effect pursuant to *Univ. of Tennessee v.*

of the case is built on the premise that her entitlement to residential habilitation services is contained within her March 2003 Plan of Care. However, that Plan of Care is no longer of any relevance because it was superseded by the May 2004 Plan of Care. And Doe cannot now point to the May 2004 Plan of Care as the source of her entitlement to residential habilitation services because that Plan of Care would have expired in May 2005, and her eligibility for these services has never been extended by a more current Plan of Care (for the reason, of course, that Doe has been found ineligible). The majority leaves me baffled as to how, upon remand, the district court should go about deciding whether Doe is now entitled to prospective relief[4] based on an alleged entitlement to services found in a Plan of Care that expired years ago, while turning a blind eye to the fact that recent state administrative proceedings have resulted in a determination that Doe is not even qualified to be a Medicaid recipient.

The only document in the record showing that Doe has a present entitlement to Medicaid services is a recent Administrative Order of the DHHS Hearing Officer, filed with this Court pursuant to Fed. R. App. P. 28(j), determining that Doe should continue to receive "respite" services, but not "residential habilitation" services, pending the outcome of the administrative appeal of her termination from the Medicaid MR/RD Waiver program. To me, it seems entirely appro-

---

*Elliott*, 478 U.S. 788 (1986). This line of argument misses the point. The state administrative actions are not collateral estoppel in the present case not only because there has not yet been a final judgment (on account of Doe's appeal to the State Administrative Law Court), but more importantly because there is no identity of issues: the issue before the State administrative decisionmakers is whether Doe is eligible for Medicaid ICF/MR services at all, while the issue before us is whether Doe has been furnished with reasonable promptness the services for which she has been deemed eligible. Nonetheless, the State administrative decisions must be factored into our standing analysis, because maintaining a legally cognizable interest in the outcome of this lawsuit presupposes that Doe's eligibility has not changed in a way that would render the relief sought nugatory.

[4]Any prayer for retroactive, compensatory relief would be barred by the Eleventh Amendment. *See Lynn v. West*, 134 F.3d 582, 587 (4th Cir. 1998).

priate that the State Medicaid agency, having found Doe to be ineligible for comprehensive "residential habilitation" services, would fund only necessary "respite" services pending the administrative law judge's decision, since by the majority's own definition "respite" is intended to be a temporary gap-filling measure and not a long-term solution. And since Doe is in fact being provided "respite" services at this time, she has no basis to claim that the State is failing to furnish the services for which she is eligible with the required degree of promptness.

In sum, because Doe cannot, as of today, make a showing that she is entitled to residential habilitations services in the first place, there can be no live controversy surrounding the derivative issue of whether those services have been furnished in a reasonably prompt manner. Moreover, even if we assume that Doe ultimately will prevail in her administrative appeal and that her eligibility for "residential habilitation" services will be reinstated, I have no reason to believe that DDSN would at that point defy the order of a state administrative law judge and refuse to place Doe promptly in an appropriate facility that provides those services. Thus, this is no longer (if it ever was) a case that is capable of repetition yet evading review. Therefore, even if I agreed with the majority that Doe's "reasonable promptness" claim was not moot at the time of the district court's judgment, I would now dismiss her appeal as moot, or at the very least remand to the district court for additional findings with respect to how these post-judgment developments at the administrative level impact her standing.

## II.

Because I believe that Doe's "reasonable promptness" claim is moot, I would not reach the thorny issue of first impression in this circuit of whether 42 U.S.C. § 1983 provides Doe with a remedy for alleged violations of 42 U.S.C. § 1396a(a)(8). Nonetheless, because the majority does reach this question in Part II.B. of the lead opinion, I feel compelled to explain why I believe the majority's holding is legally incorrect.

With respect, I do not believe that the three-factor test of *Blessing v. Freestone*, 520 U.S. 329 (1997), should control our analysis in light of the Supreme Court's more current opinion in *Gonzaga Univ. v.*

*Doe*, 536 U.S. 273 (2002), which was explicitly intended to resolve considerable uncertainty stemming from the Court's prior opinions on the subject.[5] In the *Gonzaga* opinion, the Supreme Court reemphasized a fundamental principle that had become obscured in cases like *Blessing*: Nothing "short of an unambiguously conferred right" will "support a cause of action brought under § 1983." *Id.* at 283. The Court then went on to hold that the judicial function is exclusively one of determining what "Congress intended" by enactment of the statute — a task which, like other matters of statutory interpretation, is to be resolved in the first instance by looking to the "text and structure" of the relevant statute. *Id.* at 285-86.

In finding an absence of congressional intent to create a privately enforceable right under FERPA, the *Gonzaga* Court considered as relevant three specific features of the statute: It "contain[ed] no rights-creating language;" it had an "aggregate, not individual, focus;" and it "serve[d] primarily to direct the Secretary of Education's distribution of public funds." *Id.* at 290. Additionally, the Court considered whether Congress "chose to provide" an alternative "mechanism" to private litigation "for enforcing those provisions." *Id.* at 289. Importantly, the Court considered the availability of administrative review to be directly relevant to the issue of congressional intent not to create a privately enforceable right, independent of the secondary issue of whether those procedures are so incompatible with private enforcement as to displace a remedy under § 1983. *Id.* at 290 & n.8.

Like FERPA, the Medicaid statute was enacted pursuant to the congressional spending power, and its primary purpose is to direct the appropriate executive branch officer (in this case, the Secretary of Health and Human Services) in the distribution of appropriated funds to accomplish the stated purpose. The Act's preamble speaks directly to these purposes, providing in relevant part as follows:

> For the purpose of enabling each State . . . to furnish (1) medical assistance . . . and (2) rehabilitation and other ser-

---

[5]*Id.* at 278 ("[O]ur [prior] opinions in this area [have not been] models of clarity. We therefore granted certiorari . . . to . . . resolve any ambiguity in our own opinions."); *see also id.* at 282-83 (limiting the import of the *Blessing* test).

vices . . . , there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.

42 U.S.C. § 1396. Due to the nature of spending power enactments as such, we begin our analysis with a presumption that Congress has not intended to create a private remedy. *See Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 28 (1981) ("In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."); *accord* 42 U.S.C. § 1396c (providing that the remedy for State noncompliance with any provision of section 1396a is the withholding of federal funds).

The very next section of the act, codified at 42 U.S.C. § 1396a, sets forth several criteria that a "State plan for medical assistance" must satisfy in order to gain federal approval and enable the Secretary to disburse federal funds. Among these requirements is the provision upon which Doe purports to base her "reasonable promptness" claim:

A State plan for medical assistance must —

(8) provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals . . . .

42 U.S.C. § 1396a(a)(8). However, this provision lacks the kind of "rights-creating language" that *Gonzaga* requires as a basis for private enforcement, and it has an "aggregate, not individual, focus." Specifically, the statute speaks only to what the state plan must generally "provide" for in order for the state's Medicaid program to qualify for federal funding. Thus, like FERPA, section 1396a(a) is written "in terms of institutional policy and practice," and does not specifically address "individual instances" of noncompliance. *Gonzaga*, 536 U.S. at 288. Indeed, with respect to the daily administration of state Medic-

aid plans, Congress chose to require only that states "comply substantially" with the requirements of section 1396a in order to remain eligible to receive federal funding. *See* 42 U.S.C. § 1396c. Similarly, the *Gonzaga* Court singled out FERPA's "comply substantially" provision as evidence that Congress did not intend to confer a privately enforceable right. *Gonzaga*, 536 U.S. at 288.

At best it can be said, as the majority holds in its *Blessing* analysis, that Doe falls within the class of persons that section 1396a(a) is intended to benefit. I do not contend otherwise, and certainly do not mean to imply that Congress would require the states to craft their Medicaid plans to protect certain individual interests without regard to whether these provisions are actually followed in practice. However, it is simply not sufficient that Doe "falls within the zone of interest that the statute is intended to protect," because it is "only violations of *rights*, not *laws*, which give rise to § 1983 actions." *Gonzaga*, 536 U.S. at 283 (emphasis in original). And nothing in the text or structure of the statute indicates that Congress intended to create judicially vindicable individual rights under section 1396a(a). Rather, the Medicaid statute in essence defines the parameters of a voluntary, pseudo-contractual relationship between the Federal government on the one hand and the states on the other. *Cf. Pennhurst State School*, 451 U.S. at 17. The statute is directed in the first instance to the Secretary of Health and Human Services, setting forth the conditions upon which federal money under his stewardship is to be released in furtherance of an important public policy. The statute also addresses the states, albeit indirectly, insofar as it imposes on them certain conditions which attach to the receipt of federal money (though it does not categorically mandate state compliance insofar as states remain free to reject federal funding). But individual Medicaid recipients like Doe are at best third-party beneficiaries to this arrangement, and as such are essentially "stranger[s]" to the underlying bargain. *Blessing*, 520 U.S. at 349 (Scalia, J., concurring). Indeed, nowhere is the statute directly concerned with "whether the needs of any particular person have been satisfied," *id.* at 343, and in fact those types of individual determinations are specifically left to the states as the designated administrators of Medicaid, *see* 42 U.S.C. § 1396a(a)(5). Because the whole focus of the Medicaid statute is on the "regulated [entity] rather than the individuals protected," I must conclude that there is "no implication of an intent to confer rights on a particular class of per-

sons." *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001) (internal quotation marks and citation omitted).

Any lingering doubt that Congress might have intended to create a new battery of individual rights enforceable by section 1983 is in my mind dispelled by the fact that Congress has made other provision for redressing individual deprivations under section 1396a(a). Aside from the threat of loss of federal funding if the state's practices do not meet the substantial compliance threshold, Congress has sought to ensure the protection of individual recipients' interests by requiring that each state plan for medical assistance provide for an "opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3). Thus, Congress specifically contemplated circumstances where a Medicaid recipient has been denied the benefit of reasonably prompt agency action, and specifically provided that recourse should be available in the form of a fair hearing before the agency. Where Congress has seen fit to establish an administrative mechanism to deal with individual grievances arising in the daily administration of a program as massive and complex as Medicaid, it seems to me a reasonable presumption that Congress would have deemed the administrative remedy both appropriate and adequate to address the problem.[6] Thus, any inference that Congress might have intended to create individual rights which are judicially actionable under 42 U.S.C. § 1983 seems weak indeed. *Gonzaga*, 536 U.S. at 289-90.

If Congress had intended to subject the countless Medicaid decisions made by state agencies each day to the scrutiny of the federal judiciary, I would expect to find clear and unmistakable language in the statute stating as much. In the absence of such language, I cannot be so cavalier as the majority in imputing to Congress an intent to allow dissatisfied Medicaid recipients to have their routine grievances aired in federal court under the auspices of 42 U.S.C. § 1983, and

---

[6]Of course, if a state failed to provide a Medicaid recipient with adequate pre-deprivation due process in the form of a fair hearing, then a 42 U.S.C. § 1983 action could be brought against the state, because the Fourteenth Amendment would supply the right in these circumstances. *Cf. Goldberg v. Kelly*, 397 U.S. 254 (1970).

instead would exercise the cautious skepticism toward the recognition of new "rights" by implication which the Supreme Court adopted in the now-controlling *Gonzaga* opinion. Because I cannot meaningfully distinguish between the provisions of the Medicaid Act relevant to Doe's claims and the analogous features of FERPA with respect to which the *Gonzaga* Court found no privately actionable rights, I would hold, on the authority of *Gonzaga* alone, that 42 U.S.C. § 1983 does not provide Doe with a remedy for the State's alleged violations of section 1396a(a)(8)'s "reasonable promptness" standard.

For these reasons, I respectfully dissent from Part II of the majority opinion and concur only in the judgment as to Part III.